# In re Francisco Javier MONREAL-Aguinaga, Respondent

File A93 093 210 - Dallas

*Decided May 4, 2001*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) To establish "exceptional and extremely unusual hardship," an applicant for cancellation of removal under section 240A(b) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b) (Supp. V 1999), must demonstrate that his or her spouse, parent, or child would suffer hardship that is substantially beyond that which would ordinarily be expected to result from the alien's deportation, but need not show that such hardship would be "unconscionable."

(2) Although many of the factors that were considered in assessing "extreme hardship" for suspension of deportation should also be considered in evaluating "exceptional and extremely unusual hardship," an applicant for cancellation of removal must demonstrate hardship beyond that which has historically been required in suspension of deportation cases involving the "extreme hardship" standard.

(3) In establishing eligibility for cancellation of removal, only hardship to qualifying relatives, not to the applicant himself or herself, may be considered, and hardship factors relating to the applicant may be considered only insofar as they might affect the hardship to a qualifying relative.

FOR RESPONDENT: Juan Luis Burgos-Gandia, Esquire, Richardson, Texas

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Heidi Graham, Assistant District Counsel

BEFORE: Board En Banc: SCIALABBA, Acting Chairman; DUNNE, Vice Chairman; HEILMAN, SCHMIDT, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, GUENDELSBERGER, MATHON, JONES, GRANT, MOSCATO, MILLER, BRENNAN, ESPENOZA, OSUNA, and OHLSON, Board Members. Concurring and Dissenting Opinion: ROSENBERG, Board Member.

HOLMES, Board Member:

The respondent has filed a timely appeal from an Immigration Judge's May 19, 1998, decision finding him removable as charged, denying his application for cancellation of removal under section 240A(b) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b) (Supp. V 1999), and

granting his request for voluntary departure under section 240B(b) of the Act, 8 U.S.C. § 1229c(b) (Supp. V 1999). The respondent appeals solely from the denial of his application for cancellation of removal. The appeal will be dismissed.

## I. BACKGROUND

In proceedings conducted in 1998, the respondent conceded that he was removable from the United States but applied for cancellation of removal under section 240A(b) of the Act, as well as for voluntary departure. Section 240A(b) of the Act provides that the Attorney General may cancel the removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien: (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application; (B) has been a person of good moral character during such period; (C) has not been convicted of specified criminal offenses; and (D) establishes that removal would result in *exceptional and extremely unusual hardship* to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence. Section 240A(b) of the Act; *see also* 8 C.F.R. § 240.20 (2001).

The respondent is a 34-year-old native and citizen of Mexico who has been living in the United States since his entry in 1980. He has not returned to Mexico since coming to this country as a 14-year-old child. His wife, who was not statutorily eligible for cancellation of removal, voluntarily departed to Mexico shortly before the respondent's hearing on his application for cancellation of removal, and she took their infant United States citizen child with her. The couple's two older children have remained with the respondent in the United States. The oldest child is now 12 years old and the middle child is 8 years old. Both are United States citizens.

The respondent has been gainfully employed in this country since his entry as a teenager, and he provides the sole support for his two citizen children in this country, as well as sending money to his wife in Mexico. He has worked in an uncle's business continuously since 1991. The respondent's parents lawfully immigrated to this country in 1995, and his children sometimes spend time with these grandparents when their father is working. In addition, the respondent has seven siblings who reside lawfully in the United States, as well as a brother in Mexico who also works for the respondent's uncle. The respondent's oldest child testified at the hearing about his life in this country and his desire not to depart for Mexico, which he would do if his father was required to leave the United States.

There is no dispute that the respondent satisfies the good moral character and continuous physical presence requirements for cancellation of removal.

Moreover, if he were found statutorily eligible for cancellation, we would grant relief in the exercise of discretion. In this latter regard, the Immigration Judge noted that this was a "sad" case, particularly in view of its effect on the United States citizen children, and the Immigration and Naturalization Service trial attorney characterized the respondent and his family as "really good people." Thus, the determinative issue before us is whether this respondent's United States citizen children or his lawful permanent resident parents will suffer "exceptional and extremely unusual hardship" if the respondent is ordered deported, as is required for him to establish statutory eligibility for cancellation of removal. The Immigration Judge concluded that this hardship requirement had not been met. We agree.

## II. MEANING OF THE TERM "EXCEPTIONAL AND EXTREMELY UNUSUAL HARDSHIP"

This case requires that we address the meaning of the term "exceptional and extremely unusual hardship," as used in section 240A(b)(1)(D) of the Act. Under the prior law regarding suspension of deportation, an alien, such as this respondent, seeking that form of relief had to establish that he or his qualifying relative would suffer "extreme hardship" if deported. *See* section 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1) (1994) (repealed 1996). In 1996, Congress replaced the suspension of deportation provisions of the Act with a form of relief entitled "Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents." *See* section 240A(b) of the Act.

In enacting the cancellation statute, Congress narrowed the class of aliens who could qualify for relief. Under the present cancellation statute, an alien must have 10 years of continuous physical presence in this country, rather than the 7 years necessary under the previous requirements for suspension of deportation. Furthermore, under the new statute, hardship to the applicant for relief is not considered; only hardship to the alien's United States citizen or lawful permanent resident spouse, parent, or child may be considered. Finally, as indicated above, an alien must show that his or her qualifying relative would suffer exceptional and extremely unusual hardship if the alien is deported.

The cancellation statute does not further define the term "exceptional and extremely unusual hardship." It is axiomatic, however, that the interpretation of statutory language begins with the terms of the statute itself, and if those terms, on their face, constitute a plain expression of congressional intent, they must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Citing *INS v. Phinpathya*, 464 U.S. 183, 189 (1984), we have also recognized that the "legislative purpose is presumed to be expressed by the ordinary meaning of the words used." *Matter of Crammond*, 23 I&N Dec. 9, 11 (BIA 2001).

The terms "exceptional" and "extremely unusual" seemingly have ordinary meanings. "Exceptional" is defined as "[f]orming an exception; not ordinary; uncommon; rare." *Webster's New International Dictionary* 888 (2d ed. 1959). The added phrase "extremely unusual" plainly indicates circumstances in which the exception to the norm is very uncommon. The "plain meaning" of these terms becomes somewhat less clear, however, when appended to the term hardship, which can have multiple manifestations and inherently introduces an element of subjectivity into this statutory phrase. If the past 50 years have demonstrated nothing else with regard to the phrases "exceptional and extremely unusual hardship" and "extreme hardship," they have shown that reasonable people can agree that the meaning of these terms is "clear," but come to quite different conclusions as to their application in various factual situations. These are not terms of "fixed and inflexible content or meaning." *Matter of Hwang*, 10 I&N Dec. 448, 451 (BIA 1964) (addressing "extreme hardship").

It is obvious, however, under the plain meaning of the words used in the two statutes, that the hardship standard for cancellation of removal is a higher one than that under the suspension of deportation statute. *See generally Cortes-Castillo v. INS*, 997 F.2d 1199 (7th Cir. 1993) (noting that the exceptional and extremely unusual hardship standard is more restrictive than the extreme hardship standard); *Brown v. INS*, 775 F.2d 383 (D.C. Cir. 1985) (same); *see also Hernandez-Cordero v. INS*, 819 F.2d 558, 565 (5th Cir. 1987) (Rubin, J., dissenting) ("Had Congress intended to restrict relief so narrowly [in section 244(a)(1) of the Act], it could easily have substituted words like those used in the next part of section 244(a), where relief for certain groups of aliens such as convicted criminals and anarchists is limited to cases of 'exceptional and extremely unusual hardship.'") The legislative history also plainly states that Congress intended to tighten the hardship standard, in part as a response to what it saw as a weakening of the extreme hardship requirement in certain precedent decisions of this Board. *See, e.g., Matter of O-J-O-*, 21 I&N Dec. 381 (BIA 1996); *see also* H.R. Conf. Rep. No. 104-828 (1996).

Although the legislative history of section 240A(b)(1)(D) does not attempt to further define the term "exceptional and extremely unusual hardship," it does provide some guidance as to Congress' intent in adopting the term. The House Conference Report states that "[t]he managers have deliberately changed the required showing of hardship from 'extreme hardship' to 'exceptional and extremely unusual hardship' to emphasize that the alien must provide evidence of harm to his spouse, parent, or child *substantially beyond that which ordinarily would be expected to result from the alien's deportation*." H.R. Conf. Rep. No. 104-828 (emphasis added). The legislative history also talks of this relief being available "in truly exceptional cases." *Id*. Thus, it appears that Congress intended that cancellation of removal should be available to nonpermanent residents only in compelling cases.

We are aware of the general rule that when "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985). Here, only a phrase, not a whole section of law, was adopted from the prior law. The origins of the phrase "exceptional and extremely unusual hardship" are in the Immigration and Nationality Act of 1952, ch. 477, 66 Stat. 163 ("1952 Act"). There is both legislative history from the 1952 Act and subsequent case law involving this phrase that we can look to in an attempt to clarify its meaning.

Under the 1952 Act, as originally enacted, "exceptional and extremely unusual hardship" was the hardship standard applicable to all applicants for suspension of deportation.[1] The legislative history of the 1952 Act reflects that, at the time, Congress intended that the exceptional and extremely unusual hardship standard be a very high one indeed. The House Report states that suspension of deportation "should be available only in the very limited category of cases in which the deportation of the alien would be unconscionable." H.R. Rep. No. 82-1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1718; S. Rep. No. 82-1137, at 25 (1952); *see also INS v. Phinpathya*, *supra*, at 190-92; *Asikese v. Brownell*, 230 F.2d 34, 36 (D.C. Cir. 1956); *Matter of M-*, 5 I&N Dec. 261 (1953).

We are not persuaded, however, that the relevant cancellation standard should be that a respondent's deportation be "unconscionable" in its effect on a qualifying relative before a respondent can be found eligible for cancellation of removal under section 240A(b) of the present Act. The legislative history of the 1952 Act referencing such hardship is nearly 50 years old and arose in a different statutory context. Moreover, although the hardship term used then is the same as the one we consider now, there is nothing in the legislative history of the current cancellation statute to suggest that such an extreme standard should be applied. In fact, as discussed above, that history suggests a standard that, although high, is clearly less than "unconscionable." Furthermore, 50 years of case law regarding the meaning of both "extreme hardship" and "exceptional

---

[1] In 1962, Congress amended the suspension of deportation provisions, reconfiguring former section 244(a) from five subsections into two. The prior "exceptional and extremely unusual hardship" standard was retained for immigration offenders deportable under specified statutory grounds, principally relating to crime, fraud, and security, who also had to show 10 years of continuous physical presence. *See* section 244(a)(2) of the Act. The then new section 244(a)(1) established, inter alia, the "extreme hardship" standard for all other applicants for suspension who only needed to show 7 years of continuous physical presence. Congress' intent was to lessen the degree of hardship required of applicants for suspension under section 244(a)(1). *See Matter of Hwang*, *supra*, at 452. The shifts in legislation regarding this form of relief reflect something of the ebb and flow of Congress' reaction to immigration over the last century.

and extremely unusual hardship" have intervened since the legislative history of the 1952 Act was promulgated. Finally, the Board case law that immediately followed the 1952 Act adopted the "unconscionable" standard, but found that the standard was met in circumstances that arguably would not now be deemed "truly exceptional." *See, e.g.*, *Matter of H-*, 5 I&N Dec. 416 (BIA 1953) (focusing principally on long residence and an inability to return to the United States); *see also Cortes-Castillo v. INS*, *supra*, at 1203-04 (7th Cir. 1993). Therefore, we do not find that an "unconscionable" standard is an appropriate one to apply in evaluating a respondent's eligibility for cancellation of removal under section 240A(b) of the Act.

Similarly, we do not find determinative guidance from the series of cases dating from 1953 to 1957, which applied the "exceptional and extremely unusual hardship standard" in the suspension of deportation context prior to the amendments to section 244 of the Act in 1962. *See, e.g.*, *Matter of C-*, 7 I&N Dec. 608 (BIA 1957); *Matter of M-V-*, 7 I&N Dec. 571 (BIA 1957); *Matter of Z-*, 7 I&N Dec. 253 (BIA 1956); *Matter of M-*, 7 I&N Dec. 147 (BIA 1956); *Matter of B-*, 6 I&N Dec. 713 (BIA, A.G. 1955); *Matter of A-*, 6 I&N Dec. 242 (BIA 1954); *Matter of S-*, 5 I&N Dec. 695 (BIA 1954); *Matter of W-*, 5 I&N Dec. 586 (BIA 1953); *Matter of J-*, 5 I&N Dec. 509 (BIA 1953); *Matter of M-*, 5 I&N Dec. 448 (BIA 1953); *Matter of P-*, 5 I&N Dec. 421 (BIA 1953); *Matter of Z-*, 5 I&N Dec. 419 (BIA 1953); *Matter of H-*, *supra*; *Matter of U-*, 5 I&N Dec. 413 (BIA 1953); *Matter of S-*, 5 I&N Dec. 409 (BIA 1953).[2]

This case law covers only that period of time when the "exceptional and extremely unusual hardship" standard was applied to all applicants for suspension of deportation, predating the period during which the standard was required principally for criminal aliens. Furthermore, in many of these cases the focus was on hardship to the alien, a hardship element that cannot even be considered under the present statute. *See, e.g.*, *Matter of S-*, 5 I&N Dec. 409 (setting out the factors to consider in evaluating the necessary degree of hardship for suspension of deportation eligibility). Finally, all of this case law arose in a different overall statutory context and obviously significantly predated the decades of interpretation of the "extreme hardship" standard that culminated in Congress' enactment in 1996 of the cancellation of removal provisions in section 240A(b) of the Act. *See, e.g.*, *Cortes-Castillo v. INS*, *supra*, at 1204 ("The definition of 'exceptional and extremely unusual hardship', now applied

---

[2] In *Matter of S-*, 5 I&N Dec. 409, we identified five factors to be considered in evaluating "exceptional and extremely unusual hardship." This decision was issued simultaneously with four other published Board decisions, cited above, which applied the standard in varying factual circumstances. The approach of providing examples and discussion in published Board decisions in varying factual settings likely remains the best manner in which to provide content to the phrase "exceptional and extremely unusual hardship" in the context of applications for cancellation of removal under the present law.

only to aliens seeking relief under section 244(a)(2), has become more stringent in the forty years since the Board decided *Matter of S.* and *Matter of U.*").[3]  In view of these considerations, as well as the fact that so many years have passed and so much intervening (and not necessarily consistent) case law has developed regarding the term "extreme hardship" since these cases were decided, we do not find that any determinative guidance considering the phrase "exceptional and extremely unusual hardship" in the cancellation of removal context arises from these early suspension of deportation cases.

Thus, although both the relevant legislative history from the 1952 Act and the old case law discussed above provide an historical context for evaluating the "exceptional and extremely unusual hardship" standard in applications for cancellation of removal, our principal focus is on the statutory language itself and the legislative history of the revisions that were enacted in 1996.  What is clear is that the term "exceptional and extremely unusual hardship" is a more restrictive standard than the "extreme hardship" standard applied in section 244(a)(1) suspension of deportation cases, particularly as it was applied in *Matter of O-J-O-*, *supra.*  The new standard requires a showing of hardship beyond that which has historically been required in suspension of deportation cases involving the "extreme hardship" standard.  As the legislative history indicates, the hardship to an alien's relatives, if the alien is obliged to leave the United States, must be "substantially" beyond the ordinary hardship that would be expected when a close family member leaves this country.  Cancellation of removal under section 240A(b) of the Act is to be limited to "truly exceptional" situations.  H.R. Conf. Rep. No. 104-828.[4]

---

[3]  A more recent Board precedent, *Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994), involved a respondent who was required to meet the more exacting exceptional and extremely unusual hardship standard for suspension of deportation because he had been convicted of a controlled substance violation.  Under the particular circumstances of that case, we found that the respondent had shown a prima facie case of exceptional and extremely unusual hardship where he had been in the United States for more than 20 years, and where the Service had "affirmatively permitted" him to remain here for many years by granting his request for deferred action.  *Id*. at 846.  However, that case did not provide a discussion of the exceptional and extremely unusual hardship standard and involved a motion to reopen where only a prima facie showing of the requisite hardship had to be made.  Thus, it is of limited value to us today.

[4]  The concurring and dissenting opinion argues that the Board has enunciated a new standard for considering applications for cancellation of removal under section 240A(b) and that fairness dictates a remand of this case for further proceedings.  However, the standard is that set forth by the new law itself and does not arise from any sudden change or unexplained departure by the Board from settled law.  Moreover, although one can argue over the degree of hardship that has been demonstrated by the evidence presented by an applicant for relief in a given case, the underlying requirement of presenting *the evidence*

(continued...)

At the same time, we recognize that some cases in which this Board or the Immigration Judges have found "extreme hardship" under the suspension statute may also have presented facts and circumstances that rose to the level of "exceptional and extremely unusual hardship." Moreover, although guidance as to this term's meaning can be provided, each case must be assessed and decided on its own facts.

## III. FACTORS TO CONSIDER

We do find it appropriate and useful to look to the factors that we have considered in the past in assessing "extreme hardship" for purposes of adjudicating suspension of deportation applications, as set forth in our decision in *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978). That is, many of the factors that should be considered in assessing "exceptional and extremely unusual hardship" are essentially the same as those that have been considered for many years in assessing "extreme hardship," but they must be weighed according to the higher standard required for cancellation of removal. However, insofar as some of the factors set forth in *Matter of Anderson* may relate only to the applicant for relief, they cannot be considered under the cancellation statute, where *only* hardship to qualifying relatives, and not to the applicant, may be considered. Factors relating to the applicant himself or herself can only be considered insofar as they may affect the hardship to a qualifying relative.

In *Matter of Anderson*, *supra*, we stated that such factors as the age of a respondent, both at the time of entry and at the time of the application for relief, family ties in the United States and abroad, length of residence in this country, the health of the respondent and qualifying family members, the political and economic conditions in the country of return, the possibility of other means of adjusting status in the United States, the alien's involvement and position in his or her community here, and his or her immigration history are all proper factors to be considered. *Id.* at 597; *see also Matter of Kao and Lin*, 23 I&N Dec. 45 (BIA 2001); *Matter of Pilch*, 21 I&N Dec. 627 (BIA 1996).

For cancellation of removal, we consider the ages, health, and circumstances of qualifying lawful permanent resident and United States citizen relatives. For example, an applicant who has elderly parents in this country who are solely dependent upon him for support might well have a strong case. Another strong applicant might have a qualifying child with very serious health issues, or compelling special needs in school. A lower standard of living or adverse country conditions in the country of return are factors to consider only insofar as they may affect a qualifying relative, but generally will be insufficient in

---

[4](...continued)
of any hardship that would arise from one's forced departure from this country has remained unchanged under the old and new laws.

themselves to support a finding of exceptional and extremely unusual hardship. As with extreme hardship, all hardship factors should be considered in the aggregate when assessing exceptional and extremely unusual hardship. *See generally Matter of Kao and Lin*, *supra*.

## IV. APPLICATION OF THE EXCEPTIONAL AND EXTREMELY UNUSUAL HARDSHIP STANDARD TO THE RESPONDENT

This case presents a good example of the difference between the "extreme hardship" and the "exceptional and extremely unusual hardship" standards. Were this a suspension of deportation case, where only extreme hardship is required and where hardship to the respondent himself could be considered, the respondent might well have been found eligible for that relief. The hardship to the respondent, particularly in view of his 20 years of residence after his entry at age 14, his loss of long-standing employment, the adverse effect of his forced departure from this country on his two school-age United States citizen children, and the separation from his lawful permanent resident parents would likely have been found to rise to the level of "extreme" hardship by a majority of this Board. However, under the cancellation of removal requirements, we cannot conclude that the respondent has established that the hardship to his citizen children or lawful permanent resident parents rises to the higher level of "exceptional and extremely unusual hardship."[5]

The respondent's two oldest children will likely relocate to Mexico with him. However, although he has lived here for many years, the respondent is 34 years old and is apparently in good health and able to work. There is nothing to show that he would be unable to work and support his United States citizen children in Mexico. His wife is also from Mexico and, as indicated above, departed the United States shortly before the respondent's hearing, taking their infant child back to Mexico with her. Therefore, should the children go to Mexico with their father, the family will be reunited. The respondent testified that his children are in good health.

The respondent's oldest child is 12 years old. He testified at the hearing that he has classes in both English and Spanish and can speak, read, and write in both languages. He testified that although he is close to his grandparents in the United States, if his father leaves this country, he will go with him. He stated that he is doing well in school, where he has friends. Asked if he would prefer to stay in the United States or go to Mexico, the child replied that he would like to stay here, "because I think it's better here than in Mexico."

---

[5] Although the concurring and dissenting opinion indicates otherwise, we have not characterized this as a "close case" under the "exceptional and extremely unusual hardship" standard that must be met to demonstrate eligibility for cancellation of removal under section 240A(b) of the Act.

The respondent's parents have been lawful permanent residents since 1995. His father still works, but his mother is not employed. The respondent did not present any evidence to show that they have any particular health problems or that there are any other unusual factors that might make it an exceptional and extremely unusual hardship for them if the respondent is returned to Mexico. The record does not reflect the ages of the respondent's parents. We note that the respondent testified that he has siblings who also live in the Dallas area, and presumably they could help their parents, should that become necessary.

Even considering all of the factors presented cumulatively, we find that the respondent has not met his burden of establishing that either his children or his parents would suffer exceptional and extremely unusual hardship if he is deported. The respondent has not provided evidence to establish that his qualifying relatives would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the deportation of an alien with close family members here.

We recognize that the respondent's children will suffer some hardship, and likely will have fewer opportunities, should they go to Mexico, and we further recognize that the respondent's parents will suffer some hardship from having their son living farther away. We have no doubt that if the respondent were eligible for cancellation of removal, we would grant such relief in the exercise of discretion. However, Congress has established an "exceptional and extremely unusual hardship" standard of eligibility for cancellation of removal, and we cannot find that the evidence presented in this case rises to the high level of hardship required under section 240A(b)(1)(D) of the Act.[6] Accordingly, the respondent's appeal must be dismissed.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** Pursuant to the Immigration Judge's order and conditioned upon compliance with conditions set forth by the Immigration Judge and the statute, the respondent is permitted to voluntarily depart from the United States, without expense to the Government, within 30 days from the date of this order or any extension beyond that time as may be granted by the district director. *See* section 240B(b) of the Act; 8 C.F.R. §§ 240.26(c), (f) (2001).

**NOTICE:** If the respondent fails to depart the United States within the time period specified, or any extensions granted by the district director, the respondent shall be subject to a civil penalty of not less than $1,000 and not more than $5,000 and shall be ineligible for a period of 10 years for any further

---

[6] The concurring and dissenting opinion reflects strong advocacy for the respondent. However, the burden of proof and persuasion rests on the respondent, and not the Immigration Judge, to establish that the respondent's removal would result in "exceptional and extremely unusual hardship" to a qualifying relative. In the end, the concurring and dissenting opinion seemingly acknowledges that this showing has not been met on the record before us.

relief under section 240B and sections 240A, 245, 248, and 249 of the Act. *See* section 240B(d) of the Act.

CONCURRING AND DISSENTING OPINION:    Lory Diana Rosenberg, Board Member

I respectfully concur in part and dissent in part.

I concur with the majority's conclusion that in enacting section 240A(b)(1)(D) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b)(1)(D) (Supp. V 1999), Congress foreclosed certain aliens from eligibility for relief from removal based on long-term residence in the United States. I also agree that while the plain meaning of the individual words in the standard "exceptional and extremely unusual hardship" may be commonly understood to refer to some type of difficulty or burden that is uncommon, rare, or different from the norm, these are not terms of "fixed and inflexible content or meaning." *Matter of Hwang*, 10 I&N Dec. 448, 451 (BIA 1964).

As the majority acknowledges, our interpretation of this standard, even as defined by the plain meaning of the words used, tends to be subjective in nature and is largely dependent on definition through case-by-case application. Therefore, I believe that the critical elements in any cancellation of removal adjudication always will be the evidentiary factors and how they are presented.

As discussed below, I am not comfortable with the majority's attempt to distinguish the meaning of the language of this standard, as a matter of law, from the very same language that has existed and been applied in the Act since 1952. In light of the fact that we are pronouncing a different interpretation of this standard in the context of cancellation of removal for the first time, I believe it more prudent to remand this case to give the respondent an opportunity to submit evidence that might allow him to satisfy the standard that we have articulated today.

## I. EXCEPTIONAL AND EXTREMELY UNUSUAL HARDSHIP

The majority's effort to justify our giving a different meaning to Congress' repeated use of the phrase "exceptional and extremely unusual hardship" as the standard for certain cancellation of removal applications is simply unpersuasive. I find no basis for invoking an exception to the principle that "Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law," merely because Congress adopted only a phrase and not a whole section of prior law. *Lorillard v. Pons*, 434 U.S. 575, 581 (1978); *see also Matter of Monreal*, 23 I&N Dec. 56, 60 (BIA 2001). More specifically, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, *supra*, at 580-81 (citing *Albemarle Paper Co. v.*

*Moody*, 422 U.S. 405, 414 n.8 (1975); *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 366 (1951); *National Lead Co. v. United States*, 252 U.S. 140, 147 (1920); 2A C. Sands, *Sutherland on Statutory Construction* § 49.09, and cases cited (4th ed. 1973)).

The "exceptional and extremely unusual" language was not only the hardship standard that applied to all suspension of deportation applications under the Act between 1952 and 1962, but represents the standard that, until 1996, continued to govern our hardship adjudications in suspension of deportation claims presented by aliens who were subject to deportation for criminal, fraud, or security violations of the Act.[1] The legislative history reflects that in enacting this form of cancellation of removal, Congress apparently examined closely the historical underpinnings and application of the suspension of deportation provisions. Indeed, Congress not only explicitly adopted the stricter hardship standard, which had existed all along, but also eliminated altogether access to this form of relief for individuals convicted of criminal offenses and incorporated across the board the requirement that an individual have 10 years of continuous physical presence to qualify for relief.

Each of the changes reflects Congress' awareness of the prior 10-year suspension of deportation provision, including the specific hardship standard that had been applied over the years. Surely, by virtue of making these changes, Congress must be deemed to have considered how we had interpreted and applied that standard. Therefore, I cannot agree with the majority's wholesale rejection of our case law addressing the "exceptional and extremely unusual hardship" standard as providing nothing more than an "historical context." Rather, it provides the context that gives this phrase meaning. *See Matter of O-J-O-*, 21 I&N Dec. 381, 389-90 (BIA 1996) (Holmes, concurring) ("In my view, the best manner in which to provide 'content' to this 'ambiguous phrase' is to provide examples and discussion in published Board decisions of factual circumstances in which the Board has concluded that the 'extreme hardship' requirement for suspension of deportation eligibility either has or has not been met.").

---

[1] *See Matter of Pena-Diaz*, 20 I&N Dec. 841 (BIA 1994); see also cases involving the exceptional and extremely unusual hardship standard as construed under the Immigration and Nationality Act of 1952, ch. 477, 66 Stat. 163 ("1952 Act"), in which the more stringent standard was met, e.g., *Matter of S-*, 5 I&N Dec. 409 (BIA 1953) (holding that the standard was satisfied by a 27-year residence, limited savings, and the prospect of severe financial hardship); *Matter of W-*, 5 I&N Dec. 586 (BIA 1953) (finding that the standard was satisfied by a married female with residence of 9 years, few assets, and five dependent children). *But see Matter of V-*, 7 I&N Dec. 348 (BIA 1956) (holding that a stowaway with 9 years of residence, no dependents, and no home to be broken up failed to meet the standard).

Similarly, I do not agree that we somehow are being evenhanded in rejecting this case law, while also rejecting a statement in the legislative history of the 1952 Act that the hardship must rise to an "unconscionable" level before it will meet the standard. It is the case law that interprets the legislative provisions, and not a prior legislative statement intended to guide that interpretation, that makes up our jurisprudence as to what constitutes exceptional and extremely unusual hardship. It is that jurisprudence of which Congress is presumed to be aware when it legislates anew and uses the same language. *See Lorillard v. Pons*, *supra*. Therefore, I believe that the existing body of our prior case law does provide useful guidance in determining whether a showing of exceptional and extremely unusual hardship has been made.

## II. DUE PROCESS AND EVIDENTIARY FACTORS

Whatever "meaning" is settled upon as a matter of law, the application of the "exceptional and extremely unusual hardship" standard to individual cases is dependent on a variety of factors and variables, considered individually and in combination. In the instant case, the removal hearing took place 3 years ago, in 1998. Although the statute was amended in 1996 to include the cancellation of removal provision at issue here, the new provisions only took effect on April 1, 1997. The Notice to Appear (Form I-862) in the respondent's case was filed with the Immigration Court on October 16, 1997. The respondent was represented by counsel and filed for cancellation of removal.

According to the transcript, when the removal hearing convened, the respondent was represented by counsel. In a perfunctory exchange that filled less than half of a page in the transcript, the Immigration Judge and the respondent's counsel agreed that the respondent would apply for cancellation of removal. In his decision, the Immigration Judge found that the respondent was truthful in his testimony and that he was a person of good moral character who had resided in the United States since 1980, when he was approximately 15 years of age. However, the first time there is ever any meaningful discussion of the standard applicable to the respondent's cancellation of removal application is in the Immigration Judge's decision.

There is no evidence that the Immigration Judge put the respondent on notice of the burden of proof he must meet, or that he specified what he understood "exceptional and extremely unusual hardship" to mean, or how he would apply that standard to the evidence provided by the respondent. *See* 8 C.F.R. § 240.11 (2001). At best, after all of the evidence had been presented, the Immigration Judge, at the end of his oral decision, offered some allusion to ball parks and parking lots. Accordingly, all that the respondent had to rely on to determine what standard he had to meet would have been our earlier decisions interpreting the "exceptional and extremely unusual hardship" standard.

We now have declared that we understand "exceptional and extremely unusual hardship" to mean something *other* than what is expressed in those precedent decisions. I conclude that under these circumstances, the prudent course of action is to remand the case and allow the respondent to present whatever evidence he may have to meet the standard that we just have articulated. *See Matter of Alarcon*, 20 I&N Dec. 557, 562-63 (BIA 1992) (remanding to allow adjudication of an application under a new standard); *see also Singh v. INS*, 213 F.3d 1050, 1053 (9th Cir. 2000) (criticizing the Board for applying a new standard that went beyond the terms of the regulation without giving the respondent notice or an opportunity to comply).

When the removal hearing began, the respondent's infant son Javier had just been born. The respondent and his wife had been married since 1987 and had lived together in the United States at all times. The respondent and his wife have two other children, Daisy and Eric, both born in the United States, who are now 8 and 12 years old respectively. The children's father—the respondent—had lived in the United States since he was a teenager. The children have a substantial extended family in the United States. The respondent and his entire family lived together until, apparently, the respondent's wife was denied cancellation of removal and was required to leave the United States for Mexico. The two older children, who had lived in the United States their entire lives, remained here with their father and their grandparents, aunts, and uncles.

This is the backdrop against which we must consider whether the children's hardship, should their father be removed, would be "exceptional and extremely unusual." The majority admits that this is a close case. The majority states specifically that under the "extreme hardship" standard, the respondent likely would have prevailed. *Matter of Monreal*, *supra*, at 64 (finding that under the extreme hardship standard, the respondent might well have been found eligible for suspension of deportation). Moreover, the majority states specifically that there is no dispute that the respondent satisfies the good moral character and continuous physical presence requirements for cancellation of removal and that, had the respondent satisfied the hardship standard, we would likely grant relief in the exercise of discretion. *Id.* at 57-58, 64-65.

So, why does the respondent not qualify under the exceptional and extremely unusual hardship standard? I agree that our determinations should comport with Congress' expression in the legislative history of the 1996 revisions to the Act that cancellation of removal should be based on hardship that is "*substantially beyond that which ordinarily would be expected to result from the alien's deportation.*" H.R. Conf. Rep. 104-828 (1996) (emphasis added). However, it is clear to me that, given the subjective nature of the relief at issue, the reason that the respondent may have fallen short of qualifying for relief is not necessarily attributable to substantive considerations. Rather, as with many other such cases, the ultimate determination in this case actually turns on evidentiary considerations.

In *Matter of Pilch*, 21 I&N Dec. 627 (BIA 1996), we emphasized that the principal problem with the case was an evidentiary one. *See id*. at 630 ("[W]e find the testimony and evidence *insufficient to demonstrate* that their deportation would cause extreme hardship to themselves." (Emphasis added.)). For example, we found that respondents' claims were largely based on the general economic conditions in Poland and not on any condition or circumstance unique to them. *Id.* In addition, we noted that "[i]n any case, *there is minimal evidence* that he would be unable to recoup his investment in the business he and his partner established in 1993." *Id*. at 631 (emphasis added). In addressing the claimed hardship to the respondents' children, we stated that "*[t]here is no evidence* that the children suffer from any physical or mental disabilities . . . [and] no evidence that they would be deprived of educational opportunities if they go to Poland." *Id*. at 632 (emphasis added).

Had the evidence been presented differently in *Matter of Pilch*, *supra*, the outcome might have been different under the extreme hardship standard. Likewise, if the evidence offered in the respondent's case is presented differently, the outcome may well be different under the exceptional and extremely unusual hardship standard.

The majority contends that "[t]his case presents a good example of the difference between the 'extreme hardship' and the 'exceptional and extremely unusual hardship' standards. Were this a suspension of deportation case, . . . the respondent might well have been found eligible for that relief." *Matter of Monreal*, *supra*, at 64. However, we are not considering only the hardship to the respondent or an aggregate of the hardship to the respondent and his qualifying family members. We are considering only the hardship to his United States citizen children and his lawful permanent resident parents.

The significance of the respondent's 8- and 12-year old children's acculturation as United States citizens in an American family is very likely far greater than what is suggested by the minimal amount of evidence that was presented at the hearing or considered by the Immigration Judge. Specifically, the children's birthright citizenship status, their ties to their grandparents and extended family in the United States, the substantial amount of time they have been schooled in the United States educational system, and their socialization in the United States generally, are all factors that are unique to these children. The potential value of these United States citizen children's ties certainly is *in* the "parking lot" or a "ball park," not out of it, as the Immigration Judge put it. Consequently, with a proper and extensive evidentiary presentation, it is possible that the children's loss and the nature of the hardship they would suffer if their father is removed and those ties are severed may very well be "exceptional and extremely unusual."

Neither the majority nor the Immigration Judge really articulate why the evidence in the case might not be found to satisfy the "exceptional and extremely unusual hardship" standard, other than to say that the new standard

requires a more unique and extreme form of hardship.  Yet the respondent who was granted suspension of deportation in *Matter of O-J-O-*, *supra*, merely came to the United States at a young age, lived here for a significant period of years, worked, and became acculturated.  This respondent not only came to the United States at a young age, worked, and lived here several years longer than did the respondent in *Matter of O-J-O-*, but he also established an entire immediate family—and has close ties with his siblings and parents—in this country.  These factors have a significant bearing on the hardship to his children.

Unlike the respondent in *Matter of O-J-O-*, this respondent likely has inculcated into his children the American values he himself adopted over the 20-year period of his residence.  Similarly, unlike in *Matter of Pilch*, *supra*, these children are not just 4 and 5 years old.  *Cf. id.* at 632.  Simply by virtue of being 8 and 12 years old, they are more than likely to have been socialized through years in the school system and in their communities.  Although they have been exposed to the Spanish language, the record is not as clear as it is represented to be that even the older child, Eric, can really manage academic studies in the Spanish language.

The issue before us really is whether their father's removal will cause exceptional and extremely unusual hardship to these two preteen-age children, who already have been separated from their mother and younger sibling.  Is there hardship that is "'*substantially beyond that which ordinarily would be expected to result*'" from their father's deportation?  *Matter of Monreal*, *supra*, at 59 (quoting H.R. Conf. Rep. No. 104-828).

Unquestionably, the children face a dramatic change in their day-to-day lives.  Even putting the potential change in their economic circumstances and standard of living aside, they face a change of geography, climate, cuisine, culture, language, and social mores.  They face a loss of their home, their childhood roots, their friends, and their customary family circle.  They face separation from their grandparents.  They face a completely different school system and classes taught in a completely different language.  Are the hardships resulting from these involuntary changes "truly exceptional"?

The legislative history emphasizes that the *ordinary* results of a parent's removal are not to be considered in determining the existence of exceptional and extremely unusual hardship to qualifying family members.  The ordinary results of a parent's deportation relative to his or her United States citizen children may well be leaving one's home and friends for another country and possibly having to adapt to a new school system or a reduced standard of living.

However, not every United States citizen child of a parent who is subject to removal has spent his or her whole life in this country, maintaining no ties to his father's homeland.  Just as the respondent's arrival as a teenager and lengthy residence here make it more likely that *he* also is assimilated to the United States, these children very likely lit sparklers on the Fourth of July, marched in the Columbus Day parade, and cheered as loudly as any other American during

the World Series.  Not every child has a parent subject to removal who has lived here since his formative years.  Not every child of a removable parent is approaching his or her teenage years.  Not every child has grandparents who have immigrated here from their home country.  Not every child would have to readjust to a society and a school system where classes are conducted in a different language.

Moreover, the Immigration Judge grossly erred in his assumption that it would be "counterproductive" to grant cancellation because the respondent's wife had returned to Mexico.  Amazingly, the majority seems to accept the notion that under the circumstances of the children's mother having had to return to Mexico, their having to accompany the respondent upon his removal would likely be the occasion for a family reunion, rather than an exile.  To the contrary, the fact that their mother was forced to leave them and go back to Mexico with their little brother is more than likely an exacerbating condition that makes the potential hardship faced by these children even greater.  Their mother's departure with their infant sibling was not a joyful or desired event, but one that the family was required to face owing to her lack of lawful immigration status in the United States.

Accordingly, I believe that the children's inevitable departure with their father can be seen as a very serious *additional* loss that they will be forced to bear when they are most vulnerable, and when the stability of their family life already has been shattered.  Their father's removal, and their departure with him, will force them to face even greater disruption in the regularity and stability of their lives.  To simply say that the respondent's wife is from Mexico, and the respondent is from Mexico, as though that makes it an "ordinary," rather than an unusual, hardship for the children to have to leave their home forever to accompany their father to that country, completely ignores the fact that these children are Americans.  *See Matter of Cervantes*, Interim Decision 3380, at 31 (BIA 1999) (Rosenberg, dissenting) (criticizing the majority for minimizing the hardship that a naturalized citizen would face merely because she speaks Spanish and was born in Mexico).

Although I believe that some of my suppositions regarding the extraordinary nature of the ties that the children will be forced to sever and the hardship they will have to endure may well be correct, they are not substantiated in the record. The deficiency in the record before us is the lack of corroborating and supporting evidence that forcefully demonstrates that the hardships to the children truly will be of a level that meets the exceptional and extremely unusual hardship standard.

Such evidence might include a professional evaluation of the children's language capabilities; individual medical and psychological reports by expert witnesses indicating the potential impact of relocation to Mexico on the children's development and ability to flourish; authoritative documentation indicating the similarities and differences between the United States and

Mexican school systems; recognized sociological studies reflecting the ability of United States citizen children to adapt to different cultures and countries; economic studies indicating the likely employment prospects for the respondent and the resulting effect on the children's standard of living; reports regarding the anticipated ease or difficulty of later adjustment to United States social and educational standards, should the children wish to return when they reach college age; and any information concerning the children's ability to maintain contacts with their aunts, uncles, grandparents, friends, teachers, or other influential figures in the United States.  In all cases, were evidence of this type to be presented, it must be specifically linked to these individual children, in terms of their gender, age, level of development, level of achievement, and any special problems or needs that they may have.  Any reports should be authenticated. Any evaluations should be attested to under oath, with a recitation of the qualifications of the maker of the document.  All expert witnesses should be available to appear in court, give direct testimony, and be cross-examined.

   I note that a motion to reopen that states new facts to be proved at a reopened hearing and establishes that such evidence is material and was not previously available or discoverable may be filed within 90 days of a final administrative order.  *See* 8 C.F.R. § 3.2(c) (2001).  However, in light of the fact that neither the parties nor the Immigration Judge had the benefit of our interpretation of the statutory standard at the time of the hearing, I would remand the record for further proceedings.  This will give all the opportunity to present any available evidence that may better substantiate the respondent's claim and will allow the Immigration Judge to make a decision consistent with our interpretation of the statute.  Accordingly, I concur in part and dissent in part.