NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0199n.06

No. 20-3552

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Apr 20, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| IMELDA LOPEZ-SOTO, | ) | |
| Petitioner, | ) ) | |
| | ) | |
| v. | ) ) | ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS |
| MERRICK B. GARLAND, Attorney General, | ) ) | |
| Respondent. | ) ) | |

BEFORE: DAUGHTREY, MOORE, and THAPAR, Circuit Judges.

DAUGHTREY, J., delivered the opinion of the court in which MOORE, J., joined. THAPAR, J. (pg. 13), delivered a separate opinion concurring only in the judgment.

MARTHA CRAIG DAUGHTREY, Circuit Judge. In an era in which it is difficult to find any issue upon which a large percentage of Americans agree, few people would dispute that our nation's immigration system is broken and is need of a structural overhaul. Admittedly, a not-insignificant number of Americans believe that any change to our immigration statutes should result in shutting our borders to almost all individuals, or at least to all potential immigrants who are not blond-haired and blue-eyed. A June 2020 survey by the Pew Research Center found, however, that approximately 74% of people surveyed felt that our immigration laws should be amended to provide legal status to the approximately 650,000 individuals now in the United States who were brought illegally to this country as children. *See* pewresearch.org/fact-tank/2020/06/17/americans-broadly-support-legal-status-for-immigrants-brought-to-the-u-s-illegally-as-children/ (last visited Apr. 2, 2021). That same study further found that approximately

75% of the surveyed individuals supported a pathway to legal status for the approximately 10.5 million other immigrants who now reside in the United States without recognized legal status. *Id.*

Until the immigration system is reformed, however, individuals like petitioner Imelda Lopez-Soto—who has resided in this country for 21 consecutive years, who has remained employed and paid her federal income taxes when required, who has committed no crimes other than driving on a revoked license, and who has given birth to and raised two admittedly outstanding young boys who are United States citizens—remains subject to removal to a country from which she fled for greater opportunity and for a chance to participate in the so-called American Dream. She now petitions this court for review of a decision of the Board of Immigration Appeals (BIA) that denied her requests for withholding of removal, protection under the United Nations Convention Against Torture (CAT), and cancellation of removal. Constrained by precedent and by our immigration laws as they now exist, we must deny her petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

In March 2000, when she was 19 years old, Imelda Lopez-Soto, a citizen of Mexico, entered the United States illegally at Nogales, Arizona. Later that month, she made her way to Madison, Tennessee, north of downtown Nashville, and since that time, has remained employed, first at American Appliance where she prepared grills for shipping, and then at Trust Building Services for whom she cleaned offices. Approximately three years after her entry into the United States, she became involved with her partner, Amado De Dios Mendoza, with whom she remains in a committed relationship and with whom she has two children, Francisco De Dios-Lopez, born in Tennessee in April 2005, and Joseph De Dios-Lopez, born in Tennessee in November 2007.

Not until 2016 did the Department of Homeland Security begin removal proceedings against Lopez-Soto by issuing her a notice to appear before the Immigration Court in Memphis, Tennessee. Pursuant to that notice, Lopez-Soto first conceded removability and then appeared before an immigration judge for an evidentiary hearing in June 2017.

At that hearing, Lopez-Soto admitted that she had failed to file for asylum within the one-year statutory period but indicated her desire to seek withholding of removal, protection under the CAT, and cancellation of removal. In support of her requests, Lopez-Soto testified that, although she personally never had been physically harmed or threatened while she lived in Mexico, a number of her male relatives had been kidnapped, injured, or murdered, presumably at the hands of Los Zetas, a transnational criminal organization and drug-trafficking cartel.

Specifically, she recounted that her cousin Ricardo was kidnapped, along with 15-20 other youths, in 2011 by the Zetas. Although a police report was filed regarding the incident, none of the boys has been heard from since, and the police simply told the family, "[L]et's just wait." Another cousin, Miguel, was kidnapped by the Zetas in 2017 but was returned to his family after payment of a ransom. Lopez-Soto testified that she was told that a third male relative, her brother-in-law Augustine, was robbed by the Zetas, shot twice in the hand, and then beaten by the cartel shortly after recovering from the first assault. Although the police claimed to be investigating that 2012 shooting, the family again was told "to wait." Lopez-Soto further testified that she was told by neighbors that the Zetas were responsible for the murder of her cousin's husband, Arnulfo, in February 2017. Again, although the murder was reported to the authorities, Lopez-Soto claimed that the police told the family to "just wait." Finally, she related to the immigration judge that her sister's father-in-law was beaten by an acquaintance, but that when the police went to the attacker's home, "he wasn't there anymore."

As a result of the violence perpetrated against members of her extended family, Lopez-Soto feared that, if she were to be returned to Mexico, the Zetas would kidnap her, force her to work for them, and possibly rape her. She further claimed that the cartel would find her wherever she located in Mexico and would torture her because she is "totally not known to them or because they're just bad people."

At the hearing, Lopez-Soto also testified that she feared for the health and well-being of her two sons if she were removed to Mexico. Both boys suffer from allergies and asthma, and she is afraid they would not be able to access the necessary medical care in Mexico. Moreover, although she speaks to her children "in Spanish and a little bit in English," the boys understand "[j]ust a little" Spanish and can neither read nor write in that language.

In his decision, the immigration judge denied Lopez-Soto all the relief she sought. In doing so, he noted that Lopez-Soto was not entitled to cancellation of removal because any hardship that would be suffered by her two sons if they accompanied her to Mexico would not rise to the level of the "exceptional and extremely unusual hardship" that must be shown to merit such relief. He likewise concluded that Lopez-Soto did not adduce sufficient evidence to establish entitlement to either withholding of removal or relief under the CAT.

Lopez-Soto's appeal to the BIA proved to be equally fruitless. In its decision, the BIA stated that Lopez-Soto could not succeed on her claim for withholding of removal because the particular social group identified by Lopez-Soto as being in need of protection—"Mexicans returning to Mexico after living several years in the United States"—is too amorphous and is not distinguishable "beyond the increased risk of criminal exploitation." Nor did the BIA believe that Lopez-Soto established entitlement to protection under the CAT because she "did not show that she, in particular, would likely suffer harm rising to the level of torture in Mexico, or that a

government official would likely consent or acquiesce (to include the concept of willful blindness) to future torture."

In addressing the claim for cancellation of removal, the BIA recognized that Lopez-Soto, her partner, and her children may suffer certain hardships in Mexico, including "increased chances of crime, lower wages, and possibly increased costs for medication," as well as a diminished "ability to obtain an education and acclimate in Mexico." Even so, the BIA concluded that "there is inadequate evidence [that the boys] will be deprived of an education or that the cumulative hardships [they] will experience constitute exceptional and extremely unusual hardship as contemplated by [federal statutes]."

Before the BIA, Lopez-Soto also alleged that the immigration judge violated her due process rights by failing to consider all relevant evidence. The BIA found no merit to this contention, holding that "[t]he record reflects that the underlying proceedings were conducted in a full and fair manner and the decision is based on the Immigration Judge's understanding of the applicable laws and regulations and his analysis of the evidence of record."

## DISCUSSION

### Standard of Review

The scope of our review of immigration decisions by now is well-established. If the BIA issues its own decision in a matter before it, we review that decision as the final administrative order. *See, e.g.*, *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). To the extent, however, that the BIA adopts the reasoning of the immigration judge, we also review the immigration judge's decision. *Id.* Although we review questions of law *de novo*, we review factual findings under a substantial-evidence standard. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020) (citations omitted). Under the substantial-evidence standard, findings of fact made by an agency

"must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation marks and citation omitted). We may reverse those findings only if the evidence in the record "not only supports a contrary conclusion, but indeed *compels* it." *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992) (citing *Elias-Zacarias*, 502 U.S. at 481 n.1).

**Withholding of Removal**

In 8 U.S.C. § 1231(b)(3)(A), Congress provided that, with few exceptions—none of which are relevant in this case—"the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." Thus, in order to succeed on her claim for withholding of removal, Lopez-Soto must establish a "clear probability that [s]he will be subject to persecution if forced to return to the country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (citations omitted). Moreover, she must show that one of the listed protected grounds was or would be "at least one reason" for the persecution she either has suffered or would suffer in the future. *Guzman-Vazquez*, 959 F.3d at 274.

Although the burden of establishing a clear probability that she will be subject to persecution in Mexico rests on Lopez-Soto, *see* 8 C.F.R. § 1208.16(b), evidence of past persecution would entitle her to a presumption of future persecution on the same basis. 8 C.F.R. § 1208.16(b)(1)(i). Unfortunately for Lopez-Soto, however, she admitted during her evidentiary hearing that she neither was harmed nor threatened during the 19 years she lived in Mexico before entering the United States. Thus, to justify a grant of withholding of removal, she must show that

her status as a Mexican citizen returning to Mexico after living several years in the United States necessarily would result in a clear probability that she would be subject to persecution in the future.

Lopez-Soto, however, has not established her membership in a cognizable, particular social group. We have noted that there are three components to the concept of a "particular social group": (1) a common, immutable characteristic; (2) particularity; and (3) social visibility. *Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013). A common, immutable characteristic "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Id.* (internal quotation marks and citations omitted). "Particularity refers to whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Id.* (internal quotation marks and citations omitted). Finally, the concept of "social visibility requires that the set of individuals with the shared characteristic be perceived as a group by society," *id.* (internal quotation marks and citations omitted), even though the group need not be recognizable on sight, *id.* at 672–73.

If Lopez-Soto is removed, she would share a common experience with other Mexican persons returning to Mexico after living in the United States for several years. And Lopez-Soto has submitted credible evidence both that criminal organizations kidnap, recruit, assault, torture, and "disappear" persons at shelters, on buses, and at money-transfer businesses in Mexico, and that returnees to the country are among those individuals vulnerable to such attacks. (AR 227-28) But Lopez-Soto has not presented evidence that Mexican citizens who have live in the United States for a long time "share a narrowing characteristic other than their risk of being persecuted." *Id.* at 671 (quoting *Rreshpja v. Gonzales*, 420 F.3d 551, 556 (6th Cir. 2005)). Accordingly, we

cannot conclude that Lopez-Soto has made the required showing that she belongs to a qualifying particular social group.

Because the BIA agreed with the immigration judge's conclusion that Lopez-Soto failed to identify a recognizable "particular social group" to which she belonged, the Board declined to address other elements of Lopez-Soto's withholding-of-removal claim. Lopez-Soto now argues that such a decision not to consider whether she would face future persecution or whether the government of Mexico was willing or able to protect her amounts to a tacit acceptance of her position on those elements of her argument. We previously have held, however, that "[t]he fact that [a petitioner] does not belong to a particular social group is sufficient to defeat [a] claim" of withholding of removal without addressing other aspects of the issue. *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692–93 (6th Cir. 2015).

**Relief Under the CAT**

Lopez-Soto fares no better on her request for relief under the CAT. Pursuant to that convention, as interpreted by federal regulations, the Attorney General shall not remove an applicant if the applicant can establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). As we have held consistently, however, relief under the CAT is available only if such torture "is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (citing 8 C.F.R. § 1208.18(a)(1)). Consequently, absent "the consent or acquiescence of a public official," "[t]he CAT does not afford protection [against] torturous acts inflicted by wholly private actors." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 501 (6th Cir. 2015) (citations omitted).

Although Lopez-Soto recognizes that Los Zetas are private actors, she insists that the Mexican government's inability to control the gangs and drug cartels in the country, as well as the corruption rampant in local police forces, constitutes the necessary acquiescence to justify a grant of relief. In *Zaldana Menijar*, we noted:

> The regulations implementing the CAT define the phrase "acquiescence of a public official" to require "that the public official, prior to the activity constituting torture, ha[s] [the] awareness of such activity and thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 208.18(a)(7). We have further defined "acquiescence" to include willful blindness. *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006).

*Id.*

Lopez-Soto testified credibly that male members of her family have been kidnapped, assaulted, and murdered by Los Zetas. She also attested that the Mexican police did nothing when her family reported the crimes. Notwithstanding whether the Mexican police's failure to act constituted "consent or acquiescence" to the violence, *see Haider*, 595 F.3d at 289, Lopez-Soto has not presented evidence that *she* would be tortured in Mexico. In short, no facts in the administrative record compel us to reverse the BIA's denial of CAT relief.

**Cancellation of Removal**

Lopez-Soto additionally petitions for review of the denial of her request for cancellation of removal, a form of relief that focuses not solely upon the person involved in immigration proceedings, but also upon the effects of removal on citizen-relatives of the immigrant. Pursuant to the provisions of 8 U.S.C. § 1229b(b)(1), the Attorney General is granted the discretion to cancel the removal of a nonpermanent resident if four criteria are met: (1) the person "has been physically present in the United States for a continuous period of not less than 10 years" immediately prior to applying for cancellation of removal; (2) the person "has been a person of good moral character during such period"; (3) the person has not committed a disqualifying crime; and (4) the person

"establishes that removal would result in exceptional and extremely unusual hardship" to a "spouse, parent, or child" who is a United States citizen or lawful permanent resident.

Both the government and Lopez-Soto agree that she satisfies the first three of these criteria. In addition, Lopez-Soto argues that a decision to remove her to Mexico would result in exceptional and extremely unusual hardship for her two young sons, both of whom are United States citizens and both of whom necessarily would accompany her to Mexico. According to Lopez–Soto, both boys suffer from allergies and asthma and speak little Spanish. If she were removed to Mexico with her boys, she fears that they would be unable to receive needed medical care, that they would have difficulty acclimating to the new environment, and that they might not receive the quality of education to which they have become accustomed.

The government counters by claiming that, regardless of whether Lopez-Soto can satisfy each of the § 1229b(b)(1) requirements, the ultimate decision regarding cancellation of removal is a discretionary one. *Montanez-Gonzalez v. Holder*, 780 F.3d 720, 722 (6th Cir. 2015). And because Congress has removed the jurisdiction of the federal courts over discretionary rulings by the Attorney General regarding cancellation of removal, we may not review any aspect of this claim. *See* 8 U.S.C. § 1252(a)(2)(B).

Although we do lack jurisdiction to review a *final* discretionary decision to deny cancellation of removal, *Singh v. Rosen*, 984 F.3d 1142, 1149 (6th Cir. 2021), we recently held that we still "have jurisdiction to review the Board's [underlying] ultimate hardship conclusion." *Id.* at 1150. As we explained in *Singh*, the hardship decision "resolves a mixed question about whether the facts found by the immigration judge rise to the level of hardship required by the legal test. It does not resolve a discretionary question." *Id.*

Even so, we conclude that the immigration judge did not err in determining that Lopez-Soto failed to establish the "exceptional and extremely unusual hardship" necessary to justify cancellation of her removal. In *In re Monreal-Aguinaga*, 23 I. & N. Dec. 56, 65 (BIA 2001), the

BIA noted that the hardship that is required to be shown in these types of cases must be "substantially different from, or beyond, that which would normally be expected." Thus, although it no doubt is true that Lopez-Soto's sons might not receive the same quality of education they receive in the United States and that they could have trouble assimilating in a new country, diminished educational opportunities and difficulty adapting to a new culture are not uncommon problems facing many families moving to another country. *See, e.g.*, *Singh*, 984 F.3d at 1154–55 (diminished educational opportunities are not enough to establish "exceptional and extremely unusual hardship"). Furthermore, Lopez-Soto's concerns about access to health care for her boys in Mexico are somewhat undercut by her own testimony at the hearing before the immigration judge. At the hearing, she stated that certain medicines are more expensive in Mexico than in the United States because her mother and father-in-law use the same medicines that her sons do for asthma and allergies, but she also stated that she sent money from the United States to her Mexican relatives to help pay for their medicines.

Without question, Lopez-Soto's sons would suffer hardships if forced to establish residence in Mexico after leaving the only country and culture they have known. Those hardships, however, are not "substantially different from, or beyond, that which would normally be expected." *In re Monreal-Aguinaga*, 23 I. & N. Dec. at 65. We thus find no reversible error in the immigration judge's treatment of the mixed question of fact and law in the cancellation-of-removal calculus. Having now resolved that subissue, we are without jurisdiction to address the propriety of the BIA's ultimate, discretionary ruling denying cancellation of removal.

**Due Process Claim**

Lopez-Soto further advances a general claim that the immigration judge and the BIA violated her due process rights by failing to give sufficient weight to evidence she offered at her

immigration hearing. This claim is simply an assertion that the immigration judge and BIA did not weigh the evidence as Lopez-Soto wished. In his 15-page written opinion and order in this matter, the immigration judge noted specifically that he had "considered all of the evidence in the record in its entirety regardless of whether specifically mentioned in the text of [the] decision or not." (AR 80) Nothing in the record would lead us to call that assertion into question or to conclude that Lopez-Soto has been denied due process.

## CONCLUSION

For more than 20 years, Lopez-Soto has worked diligently in this country, paid her taxes, and contributed to the economy to the benefit of all citizens. Moreover, her two sons, United States citizens themselves, are fully acclimated to American culture, to the American educational system, and to the American way of life. Yet, until our nation's immigration laws are changed, even families like Lopez-Soto's live in constant fear that they may be removed to a country besieged by violence and with which they now have little familiarity. Our duty, however, is to interpret the laws as they now are written. In this case, we find no error of law committed by either the immigration judge or the BIA. Furthermore, we cannot conclude that the facts presented in the record compel a decision different from that reached by the designees of the Attorney General. We thus DENY Lopez-Soto's petition for review.

**THAPAR, Circuit Judge, concurring in the judgment.** I have my doubts about the wisdom of courts opining on hot-button political issues or the motives of citizens who hold one position or another in those debates. And as someone who is neither blond-haired nor blue-eyed and who has benefited directly from the kindness of the American people, I believe that the American Dream is alive and well for persons of all stripes.

Thus, I respectfully concur only in the judgment.