NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1179n.06

No. 10-4558

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Nov 14, 2012*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| SAUL NAVARRO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., Attorney General, | ) | ON REVIEW FROM THE |
| | ) | BOARD OF IMMIGRATION |
| Respondent. | ) | APPEALS |
| _____ | ) | |

**Before:  BOGGS, COOK and WHITE, Circuit Judges.**

**BOGGS, Circuit Judge.**  Petitioner Saul Navarro, a native and citizen of Mexico, seeks

review of a decision of the Board of Immigration Appeals (BIA) affirming, in a short opinion, the

decision of the Immigration Judge (IJ) denying his application for cancellation of removal.  The IJ

denied Navarro's petition on the grounds that he had not demonstrated that his removal would result

in "exceptional and extremely unusual hardship" to his United States citizen wife and children.

Navarro argues that the BIA and the IJ failed to follow BIA precedent in the process of considering

hardship factors.  Navarro also argues that the BIA and the IJ seriously mischaracterized evidence

on the record, rising to an error of law.  Because the BIA and IJ conducted appropriate factor-based

analyses, and evidentiary and balancing determinations are discretionary and unreviewable, we deny

1

the petition for review. However, the case is remanded in part for the BIA to reinstate voluntary departure in its discretion.

## I

## A

Petitioner Saul Navarro, a 34-year-old native and citizen of Mexico, arrived in the United States without inspection near the end of 1996. Navarro settled in Detroit, Michigan, securing steady employment, buying a house, and fathering four children, the youngest two with Pauline Grace Miller Navarro, whom he married on May 17, 2007. On June 5, 2007, Navarro was issued a notice to appear, charging him as subject to removal as an alien not admitted or paroled. Navarro admitted removability, but sought cancellation of removal pursuant to 8 U.S.C. § 1229b(b), with voluntary departure in the alternative. After the government conceded that Navarro had established the required ten years of physical presence, the only live question remaining was whether Navarro's removal would result in "exceptional and extremely unusual hardship" to his United States citizen family.

At the hearing, Navarro and his wife testified on the question of hardship, supporting their testimony with documentary evidence. Navarro emphasized the seriousness of his children's medical conditions and the financial hardship that would result from the loss of his family's primary provider. In addition, both Navarro and his wife testified to the strong paternal bond he had with the children and the great emotional hardship that would result from separation. Navarro also maintains a relationship with his two older children from prior relationships, who visit once a week.

As to medical hardship, Navarro and his wife testified that their daughter Olivia, now six years old, suffered from breathing difficulties and recurrent ear infections, necessitating 30 sick visits

to the doctor before she turned three. Tubes inserted into her ears to control the ear infections were largely effective, but would likely need occasional replacement. In addition, Olivia experienced a febrile seizure[1] at age 20 months brought on by an ear infection; the doctor prescribed Children's Motrin to keep down subsequent fevers. Medical records for the most part corroborated this testimony except Mrs. Navarro's concerns that the seizures could cause brain damage if not watched. Navarro and his wife also testified that their son Saul, now eight years old, suffered from allergies and asthma. The government contended that there was no medical evidence on the record to support a diagnosis of asthma. The submitted medical records showed numerous doctor's visits for upper respiratory infections, a prescription for Albuterol to be used with a nebulizer, and a chest x-ray (found to be normal) ordered because of coughing and shortness of breath. When asked directly if he had any proof that his children suffer from "severe illness," Navarro said no.

As to financial hardship, Navarro testified that he was the primary income earner, making approximately $670 (after taxes) per week as a painter. If he were deported to Mexico, he would be unlikely to earn more than $100 per week as a painter. His wife only worked six hours a week, making less than $50 per week. Neither Navarro's nor his wife's families would be able to give much support: Navarro's father lives in Mexico, his wife's mother was recently laid off, and his wife's father only works a few hours a week. With respect to expenses, Navarro pays $50 weekly

---

[1]"Febrile seizures occur in about 2 to 5% of children younger than 6 years but most often occur in children aged 6 months to 3 years. Febrile seizures tend to run in families. Most children who have a febrile seizure have only one, and most seizures last less than 15 minutes. . . . Febrile seizures usually result from the fever itself. Most often, the fever is caused by an otherwise minor infection such as a viral respiratory infection. In such cases, the infection and the seizure are harmless." *Seizures in Children: Febrile Seizures*, The Merck Manual Home Health Handbook (online ed. 2009), http://www.merckmanuals.com/home/childrens_health_issues/neurologic_disorders_in_children/seizures_in_children.html#v824476 (last accessed Nov. 5, 2012).

in voluntary child support to each of his non-marital children, reimburses the state of Michigan for his children's Medicaid, and pays the mortgage, utilities, and taxes on the family duplex. Navarro's wife testified that they would lose the house if Navarro were gone for just 3 to 6 months, since she could not afford the mortgage payments of approximately $600 per month. Because of her children's health conditions, her (and the children's) lack of Spanish, and her desire to stay close to family in Michigan, Mrs. Navarro testified that she and the children would not accompany her husband to Mexico. Navarro and his wife have accrued a small amount of assets, comprising $2,500 in home equity and two cars with a total value of $3,500.

**B**

The IJ, in a decision dated December 9, 2009, concluded that the hardship to Navarro's family would not "go beyond those ordinary hardships that spouses and children of deportees often experience." The IJ reasoned that the children's medical conditions were "not any more serious" than those many other children suffer and were largely under control. The IJ also found that while the Navarros would experience a reduced standard of living, the "modicum of assets" acquired could help pay the mortgage for a few months and the family would be eligible for public assistance if necessary. The IJ also noted the close martial and family relationships and the young age of the children. Considering all these factors, the IJ found it to be "a close case indeed," but concluded that the availability of another means of adjustment of status—due to the approved relative petition filed by Navarro's wife—weighed against granting cancellation. For the same reason, the IJ saw fit to grant voluntary departure, to minimize the time for consular processing overseas.

Navarro timely filed an appeal with the BIA, and has submitted evidence to this court that he posted a voluntary departure bond of $500 within the required 5 days of the IJ's decision. Pet'r's

4

Br., Addendum D. The BIA issued a short decision on November 23, 2010, affirming the IJ's determination. The BIA was not convinced of the severity of the children's medical conditions, and followed the IJ in noting the potential means of lawful immigration. Because it had not received notice of a voluntary departure bond, the BIA did not reinstate the period of voluntary departure, entering the alternate order of removal to Mexico. This petition followed, pursuant to 8 U.S.C. § 1252(a).

## II

### A

"Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination." *Al-Ghorbani v. Holder*, 585 F.3d 980, 991 (6th Cir. 2009). "To the extent that the BIA has adopted the IJ's reasoning, however, we also review the IJ's decision." *Ibid*. Here, the BIA affirmed the IJ with a brief order, *see* 8 C.F.R. § 1003.1(e)(5), so we look to the IJ's opinion for a fuller articulation of the facts and reasoning.

In order to "protect[] the Executive's discretion from the courts," *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 417, 486 (1999), the immigration laws divest jurisdiction to review "any judgment regarding the granting of relief under section . . . 1229b [cancellation of removal]." 8 U.S.C. § 1252(a)(2)(B)(i). Therefore, hardship decisions are typically unreviewable discretionary determinations. *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 503 (6th Cir. 2008).

Nevertheless, there are exceptions to this rule, which permit a limited scope of review. *See id.* at 502. First, a later provision in the jurisdiction-stripping subsection explicitly reserves "review of constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). For legal questions, we

5

defer to the BIA to the extent that its legal conclusions rely on reasonable interpretations of the INA. *Shan Sheng Zhao v. Holder*, 569 F.3d 238, 247 (6th Cir. 2009). While factual determinations are ordinarily discretionary, some courts have held that an error of law occurs where material facts have been "totally overlooked" or "seriously mischaracterized." *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009); *see also Ayeni v. Holder*, 617 F.3d 67, 73 (1st Cir. 2010) (holding that failure to accord sufficient weight to seriousness of asthma was not legal error); *Calva v. Att'y Gen.*, 335 F. App'x 244, 247 (3d Cir. 2009) ("[A]n argument that certain evidence has been discounted, rather than mischaracterized, does not raise a legal question."). Our case law has cautioned, however, that such arguments may be "nothing more than a challenge to . . . discretionary and fact-finding exercises cloaked as a question of law." *Reyes v. Holder*, 410 F. App'x 935, 938 (6th Cir. 2011) (internal quotation marks omitted) (quoting *Abdul v. Holder*, 326 F. App'x 344, 347 (6th Cir. 2009)).

Second, we may "review the non-discretionary decisions that underlie determinations that are ultimately discretionary." *Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 710–11 (6th Cir. 2004). Specifically, a "choice by the BIA to disregard its own binding precedent—even when deciding an issue that *is* within its discretion—is *not itself* a discretionary decision." *Aburto-Rocha*, 535 F.3d at 503. *Aburto-Rocha* noted, however, that an agency's interpretation of its own precedents receives considerable deference. *Ibid*.

**B**

The cancellation-of-removal statute permits the Attorney General to cancel removal when four requirements are met: 1) at least 10 years continuous physical presence, 2) good moral character, 3) no conviction for specified offenses, and 4) demonstration that removal would result in "exceptional and extremely unusual hardship" to the alien's U.S. family. 8 U.S.C. § 1229b(b)(1).

6

Only requirement 4) is at issue in this case. To satisfy the requirement, BIA case law provides that the alien must show the hardship is "substantially different from, or beyond, that which would be normally expected from the deportation of an alien with close family members here." *In re Monreal-Aguinaga*, 23 I. & N. Dec. 56, 65 (BIA 2001). However, the alien need not show that the hardship would be unconscionable. *Id* at 61. Factors to consider include the alien's "immigration history," "conditions in the country of return," "the possibility of other means of adjusting status in the United States," and the "ages, health, and circumstances of qualifying lawful permanent resident and United States citizen relatives." *Id.* at 63. All factors should be considered in the aggregate. *Ibid*.

### III

Navarro argues that both the BIA and the IJ mischaracterized evidence by 1) discounting the seriousness of his children's illnesses and 2) failing to understand the totality of the financial hardship that would be faced by his family. We hold that although couched as legal errors, these arguments simply challenge the BIA and the IJ's discretionary assessment and weighing of facts.

### A

The IJ's decision fully discussed the Navarro children's medical afflictions and current state of treatment, including Olivia's ear infections, allergies, and seizure, and Saul's allergies and possible asthma. The IJ noted "that childhood allergies, ear infections, and asthma are common afflictions for children in the United States." Navarro argues that "the government attorney during cross-examination of both Petitioner and his wife attempted to minimize the medical problems of Petitioner's children." Pet'r Br. at 15. This may be true, but a judgment to "minimize" certain evidence goes directly to the *weight* of the evidence, not whether the evidence was overlooked or mischaracterized. Further, although the IJ did not find the illnesses rose to the level of "very serious

7

health issues," *Monreal-Aguinaga*, 23 I. & N. at 63, the IJ properly still included them in her final balancing of factors. Navarro also argues that the BIA, in finding no medical evidence on the record of asthma, "made findings directly contrary" to the IJ. Pet'r Br. at 14. The BIA's finding, however, is completely consistent with the IJ's conclusion that the children suffer from "possibly asthma." The IJ likely qualified the finding of asthma with "possibly" because—unlike most of the other conditions testified to—asthma was not directly mentioned in the medical records. In any case, it is unclear why the label of "asthma" is particularly important, since objective indicators of the extent of Saul's symptoms were considered: repeated visits to the doctor, worsening conditions in heat, and the need for medication to control coughing and shortness of breath.

**B**

Navarro also seeks to challenge the IJ's characterization of the financial hardship that his family would face. In his brief, Navarro refers to the extensive documentary evidence of expenses in the record, suggesting that the IJ and BIA did not take them into account. Pet'r's Br. at 17. First, the expenses submitted by Navarro are basic necessities of the kind a decision-maker would assume *any* homeowner is responsible for even without evidence; none are out of the ordinary. Further, the IJ recognized the serious financial hardship that would be imposed, noting the possibility of resorting to public assistance. Navarro's real contention, therefore, is that the amount of hardship the IJ required to meet the standard of "exceptional and extremely unusual" was too high. This is a discretionary determination governed by BIA precedent, not a factual miscalculation.

Navarro's argument against the BIA is somewhat stronger. In its opinion, the BIA stated that "respondent's wife is employed." While technically true, Mrs. Navarro only worked about 6 hours a week in a minimum-wage job. However, it is not clear that the BIA cited this fact to support the

proposition that Mrs. Navarro's *current* job would be sufficient to support the family. In the same sentence, the BIA noted that the wife had no chronic medical issues. Given the entire statement, it seems more likely that the BIA was making a similar point to that in *In re Andazola-Rivas*, 23 I. & N. Dec. 319, 324 (BIA 2002), where the BIA found a single mother being deported to Mexico did not meet the "exceptional and extremely unusual hardship" standard in part because her medical condition was under control and she was "young and able to work . . . [and] ha[d] developed some job skills." *Id.* at 324; *see also Galicia Del Valle v. Holder*, 343 F. App'x 45, 53 (6th Cir. 2009). Although Navarro has been the primary provider for the family, it was not erroneous for the BIA to consider the possibility of rearranging employment and financial circumstances after removal. Further, as the BIA is charged with issuing a "brief order" in such a case in the interests of judicial efficiency, it need not, and should not, "mention every piece of evidence before it or every logical element of a motion." *Precaj v. Holder*, 2012 WL 3198542, at *5 (6th Cir. Aug. 8, 2012); *see also Aoraha v. Gonzales*, 209 F. App'x 473, 476–77 (6th Cir. 2006) ("[The BIA decision] is entitled to a presumption of regularity and thus a presumption that the evidence was considered."). In this case, we may presume that the BIA considered the IJ's clear finding that Navarro was the primary income earner, and that the BIA merely supplemented the IJ's decision in order to note his wife's employability.

## IV

Navarro also challenges the BIA and IJ as misapplying controlling BIA precedent, specifically by inappropriately weighing and assessing certain factors, failing to consider the hardship factors in aggregate, and giving controlling weight to the potential for lawful means of immigration. But Navarro's real challenge is to the discretionary weighing determinations, since

9

both the BIA and IJ conducted standard factor analyses under the accepted guidance of *Andazola-Rivas* and *Monreal-Aguinaga*.

Navarro cites *In re Recinas*, 23 I. & N. Dec. 467 (BIA 2002), for the proposition that "the hardship standard is not so restrictive that only a handful of applicants, such as those who have a qualifying relative with a serious medical condition will qualify for relief." *Id.* at 470. This is an accurate statement of the law, but the IJ specifically found the ailments of the Navarro children to be common afflictions, and Navarro himself testified that they were not "severe." Whether the IJ was correct in characterizing the Navarro children's ailments as not "serious medical condition[s]" is a question of fact, which this court has no jurisdiction to review.

Navarro argues that neither the BIA nor IJ considered the hardship factors in aggregate. *See Ettienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011) ("Although difficult to imagine, such a claim could conceptually fall within our jurisdiction."). But as in *Ettienne*, Navarro cannot argue that the IJ failed to articulate the proper standard: the IJ specifically made her conclusion "[c]onsidering the totality of the circumstances and all of the evidence of the record both individually and cumulatively." Cumulative factor balancing is an inherently discretionary exercise for which legal standards are hard to articulate, and Navarro points to no BIA precedent suggesting that the balancing was done improperly. Navarro contends that "separation from family" was not given sufficient weight, but the IJ considered the close family relationship and even noted the young age of the children. This court will not second-guess the weighing determinations of the IJ or BIA.

Evaluating Navarro's next argument makes even clearer that the BIA and the IJ properly considered all the evidence in the aggregate. Navarro argues that both the BIA and the IJ gave undue weight to the possibility of lawful means of return. Yet neither gave this factor controlling weight,

10

instead considering it in light of Navarro's other evidence of hardship. The BIA decision "also note[d]" this factor after making its conclusion that Navarro had not established hardship substantially beyond that which ordinarily would be expected. The IJ used this factor as the "determinative," tie-breaking factor only after finding the case to be "close . . . indeed" based on weighing the other factors. Possibility of lawful return is especially important to consider in the aggregate, since the emotional and financial hardships experienced by the alien's spouse and children would last only during his absence. Navarro is right to counter, in his brief, that time for consular processing can be lengthy. Pet'r's Br. at 22. Yet there is no evidence that the IJ or the BIA did not weigh this risk—the IJ considered potential absence of up to several months, although not making a specific finding on the expected consular processing time. The BIA and the IJ of course need not have considered the evidence now submitted on appeal, Pet'r's Br., Addendum A, B, but even these documents do not suggest that Navarro's processing time is expected to be longer than the times surmised by the IJ.[2]

## V

There is one final matter to address in this case. In the alternative, Navarro requests the case be remanded to the BIA for reinstatement of voluntary departure. The BIA declined to reinstate the voluntary departure period on the grounds that Navarro did not provide timely proof to the BIA that a bond had been posted, pursuant to the requirements of 8 C.F.R. § 1240.26(c)(3)(ii), effective

---

[2]Navarro also argues for consideration of the additional time required to reenter now that the alternate removal order has been entered. Since Navarro *chose* to forgo voluntary departure and instead appeal, the length of time required to obtain a second waiver is irrelevant to the hardship analysis. In any case, this argument will be moot if the BIA reinstates voluntary departure. *See* Section V, *infra*.

11

January 20, 2009.[3]  However, it does not appear on the record that the IJ provided notice of this requirement, as required by the regulation. 8 C.F.R. § 1240.26(c)(3) ("The immigration judge shall advise the alien of the conditions set forth in the paragraph (c)(3)(i)-(iii)."). In cases where notice of the requirement to notify the BIA has not been provided, "[b]ecause of the recognized importance of such notice," the BIA has held that "remand [to the IJ] is the appropriate remedy." *In re Gamero Perez*, 25 I. & N. Dec. 164, 168 (BIA 2010). In certain cases where the alien has demonstrated timely payment of the bond, the BIA itself has reinstated the voluntary departure period. *E.g.*, *In re Gonzalez Arriola*, 2011 WL 1792082 (BIA Apr. 21, 2011); *In re Ayala-Medina*, 2011 WL 1792661 (BIA Apr. 15, 2011).

The government's argument that any error on the BIA's part was harmless due to the automatic termination provisions of 8 C.F.R § 1240.26(e)(1) and 8 C.F.R. § 1240.26(i) is misplaced. Although it is true that a grant of voluntary departure is automatically terminated upon a motion to reopen or reconsider or a petition for review, these provisions do not limit the BIA's ability to *reinstate* voluntary departure. 8 C.F.R. § 1240.26(h).[4] The automatic termination provisions, also effective January 20, 2009, were promulgated to resolve a circuit split over whether federal courts could toll the period of voluntary departure during appeal. *See* Voluntary Departure: Effect of a

---

[3]This provision provides in full: "An alien who has been granted voluntary departure shall, within 30 days of filing an appeal with the Board, submit sufficient proof of having posted the required voluntary departure bond. If the alien does not provide timely proof to the Board that the required voluntary departure bond has been posted with DHS, the Board will not reinstate the period of voluntary departure in its final order."

[4]This provision provides in relevant part: "An immigration judge or the Board may reinstate voluntary departure in a removal proceeding that has been reopened for a purpose other than solely making an application for voluntary departure, if reopening was granted prior to the expiration of the original period of voluntary departure."

Motion to Reopen or Reconsider or a Petition for Review, 73 Fed. Reg. 76927-01, 76928 (Dec. 18, 2008); *Dada v. Mukasey*, 554 U.S. 1 (2008). The goal was to maintain the "quid pro quo" of quick voluntary departure while protecting aliens who appeal from "facing the consequences of failing to depart." Voluntary Departure, 73 Fed. Reg. at 76928, 76929. Although the alien cannot reap the benefits of certain tolling of voluntary departure during appeal, the BIA may still *in its discretion* reinstate voluntary departure. Therefore, since the BIA based its rejection on an erroneous application of the notice requirement and not its discretion, the case should be remanded for the BIA to see fit whether to reinstate the automatically terminated voluntary departure period. We would note, as the IJ did, that while "the possibility of adjustment overseas weighs against a grant of cancellation of removal . . . [it] weighs in favor of a grant of voluntary departure.".

## VI

For these reasons, we **DENY** in part the petition for review, but **GRANT** the request to remand to the BIA for reinstatement of voluntary departure.

**HELENE N. WHITE, Circuit Judge**, (dissenting).  I respectfully dissent.

Even if Navarro's removal or deportation lasts only several months, which is highly unlikely, it will leave three United States citizens, his wife and two young children, homeless and destitute. If that does not rise to the level of "exceptional and extremely unusual hardship," one is left to wonder, what does?

Respondent acknowledges that mischaracterization of evidence could rise to legal error, as held in *Mendez v. Holder*, 566 F.3d 316 (2d Cir. 2009).  The petitioner in *Mendez* challenged the IJ's determination, affirmed summarily by the BIA, that he had not shown that his removal would result in exceptional and extremely unusual hardship to his U.S.-citizen children.  The *Mendez* court aptly observed:

> We need not decide in this case whether the circumstances concerning the health issues faced by Petitioner's children, considered in light of the questionable availability of medical care for their health needs in the event they return to Mexico with their parents, are so extreme that an agency decision finding no "exceptional and extremely unusual hardship" would be "without rational justification or based on an erroneous legal standard," *Barco-Sandoval* [*v. Gonzales*], 516 F.3d [35,] 39 [(2d Cir. 2008)] (internal quotation marks omitted), under the standards the BIA has established for determining whether an application for cancellation of removal demonstrated an "exceptional and extremely unusual hardship."  *See In re Gonzalez Recinas*, 23 I. & N. Dec. 467 (BIA 2002); *In re Andazola-Rivas*, 23 I. & N. [Dec.] 319 (BIA 2002); *In re Monreal-Aguinaga*, 23 I & N. Dec. 56 (BIA 2001) .
>
> Instead, we dispose of this petition by noting that the agency's decision rests on factfinding "which is flawed by an error of law." *Barco-Sandoval*, 516 F.3d at 40. For example, although Petitioner testified that his nine-year-old daughter has around twenty-five asthma attacks each year, several of which require emergency visits to the hospital; that she must use a home nebulizer, a specialized piece of equipment, in addition to an ordinary inhaler; and that doctors do not expect her to outgrow her asthma, the IJ did not address any of these factors.  Furthermore, the IJ stated incorrectly that "[t]he only evidence respondent has offered regarding this [asthma] is a letter from Dr. Hector Florman of the National Pediatric Center which only indicates that the children have been treated on multiple occasions with respiratory

14

infections" and concluding that "[t]here's nothing in the record to suggest that the asthma suffered . . . is severe in any way."

In addition, although the IJ concluded that Petitioner's son, who suffers from Grade II Vesicoureteral Reflux-a condition that may lead to kidney or liver failure– was "cured or . . . certainly in remission," the IJ did not address the fact that the son's yearly examinations are highly specialized and that Petitioner's area of Mexico, if he and his family are removed, has few doctors – let alone kidney specialists – and that Petitioner testified that he will not be able to travel to see specialized doctors or to pay for treatment.

We readily acknowledge that the agency does not commit an "error of law" every time an item of evidence is not explicitly considered or is described with imperfect accuracy, but where, as here, some facts important to the subtle determination of "exceptional and extremely unusual hardship" have been totally overlooked and others have been seriously mischaracterized, we conclude that an error of law has occurred. The IJ did not make an adverse credibility determination, and we are not confident that, after taking the overlooked evidence into account and describing it accurately, the agency would come to the conclusion that Petitioner has not met the standard of "exceptional and extremely unusual hardship." *See, e.g., In re Gonzalez Recinas*, 23 I. & N. Dec. at 470 ("[T]he hardship standard is not so restrictive that only a handful of applicants, *such as those who have a qualifying relative with a serious medical condition*, will qualify for relief." (emphasis added)).
. . . .
Accordingly, we grant this petition and remand the case to the BIA to evaluate – cleansed of these errors – whether Petitioner established that his citizen children will suffer "exceptional and extremely unusual hardship" in light of the standards the BIA itself established in *In re Monreal-Aguinaga* and subsequent cases.

*Mendez*, 566 F.3d at 322-23.

In the present case, the BIA mischaracterized the children's amply-documented medical conditions, stating that the children "*reportedly* have experienced ear infections and allergies," that Olivia "experienced one episode of a seizure due to high fever," and that Navarro testified that he had no proof of "severe" illness in the children."[1] AR at 4. This assessment of the children's

_____

[1]Navarro, who testified with the aid of an interpreter, did not handle cross-examination very well. He was asked on cross-examination if he had proof that his children suffered from "severe" illness, and he answered no. However, Navarro's testimony as a whole, Miller's testimony, and the children's extensive medical records establish that both children suffer from recurrent medical

15

medical conditions is contrary to Miller's testimony and the voluminous medical records Navarro submitted, which establish that at age 2, Olivia suffered a *grand mal* seizure due to a high fever and ear infection and must be monitored, and that she had 30 ear infections before age 2 1/2, when tubes were placed in her ears. Miller testified that the doctor warned that if a seizure were to recur Olivia could suffer brain damage. The medical records also showed that Olivia continues to have ear infections since the tubes were placed, and that she also has breathing difficulties and allergies that worsen in heat and summer. Similarly, Saul's medical records show more than 25 doctor visits in 4 years for upper respiratory infections and allergies, and several treatments with Albuterol, which is prescribed for treatment of pulmonary diseases, including asthma, and administered through a nebulizer and face mask. Contrary to the BIA's determination, Miller's testimony and the children's medical records establish that both children suffer from recurrent medical conditions and require frequent treatment. And, Navarro testified that if his family joined him in Mexico, medical treatment for the children, if available, would be unaffordable, and the heat and humidity there would exacerbate the children's medical conditions.

More importantly, the BIA overlooked or disregarded that Navarro's United States citizen wife and their two young United States citizen children will be left homeless and destitute if Navarro is removed to Mexico, *even if only for a few months*. The BIA's unqualified statement that Miller "is employed" is a gross mischaracterization— the record is clear that Navarro is, in effect, the sole wage earner for the family in that Miller works six hours a week and earns approximately $88 every two weeks, and has to pay for child care while she works. The record is also clear that the Navarro family receives no outside financial assistance and that Miller's parents are unable to assist

conditions that require treatment and medication.

16

financially or house her and the children. Navarro testified that the cost of living is high in Mexico, that painters earn approximately $ 20 a day, and that on that income he would be unable to provide *any* support to his wife and children.

The BIA apparently agreed with the IJ's determination that Miller would be able to sell the Navarros' assets and thereby make the land-contract payments for three to six months, presumably until Navarro is able to legally immigrate to the United States. This conclusion defies reason and is unsupported by the record. The "assets" are two used cars with a combined value of $ 3,500 and $ 2,500 of equity in the duplex in which the Navarros live. Even if Miller could sell one or both of the cars *and* even if she could miraculously obtain a loan on her near non-existent pay (having lost Navarro's salary), she would not be able pay the $ 1,363 in monthly expenses and in addition pay for food, medicine, clothing, and other necessities even for three months. Query whether Miller could work and transport the children without any vehicle, and whether any financial institution would loan her money given her meager earnings?

The BIA ignored that Navarro would need two waivers to re-enter the United States, a waiver for his illegal entry and a waiver of the final order of removal. *See* INA § 212(a)(9)(A)(i) and (B)(i)(II) (8 U.S.C. § 1182(a)(9)(A)(i) and (a)(9)(B)(ii)). The BIA ignored that many waiver applications take between 12 to 15 months for adjudication,[2] much longer than the IJ surmised. The

---

[2]Navarro's appellate brief asks this court to take judicial notice of this time period, attaching a summary of the waiver process that states:

> In certain circumstances, individuals who have been found ineligible for an immigrant visa under the Immigration and Nationality Act (INA) may be eligible to apply for a waiver of the ineligibility. At the time of the immigrant visa interview, the consular officer will make a determination as to whether an applicant is waiver eligible. If the consular officer finds an applicant ineligible for a visa, but eligible to apply for a waiver, the officer will give the applicant instructions on how to apply for

17

meager assets the Navarros have would be needed for the family's survival and to pay the substantial immigrant-visa charges and related travel costs for Navarro. In sum, regardless whether Navarro is eventually able to lawfully immigrate to the United States, in the interim, the three United States citizens he alone supports, his wife and two children, will be left homeless and destitute.

As in *Mendez*, the BIA here mischaracterized or overlooked salient facts that were essential to the determination of exceptional and extremely unusual hardship. For these reasons, I would grant the petition for review and remand to the BIA to evaluate—absent mischaracterization of the evidence—whether Navarro established that his United States citizen wife and minor children will suffer "exceptional and extremely unusual hardship."

---

the waiver and will direct them to make a waiver appointment.

The waiver application and supporting documentation are reviewed by the U.S. Citizenship and Immigration Services (USCIS), which has jurisdiction for adjudicating all waiver applications submitted in Ciudad Juarez. If the waiver is readily approvable, the applicant usually receives his or her immigrant visa via DHL courier within a few days of the waiver appointment. Otherwise, the waiver application is referred for further review and the applicant is given the opportunity to submit additional hardship evidence. Applicants are notified in writing of the waiver decision and given instructions on how to proceed. Waiver applications referred for further review normally take between twelve to fifteen months to process.

Embassy of the United States, Visas > Immigrant Visas > Waivers - The Waiver Process, http://ciudadjuarez.usconsulate.gov/waivers.html (last visited November 9, 2012). The Department of State manages this website.

18